Rose McCOY, Plaintiff,

v.

Gary M. GOLDBERG and Gary Goldberg & Company, Inc., Defendants.

Gary M. GOLDBERG and Gary Goldberg & Company, Inc., Third–Party Plaintiffs,

v.

Stephen RUFFINO, et al., Third–Party Defendants.

No. 89 Civ. 8151 (WCC).

United States District Court, S.D. New York.

March 31, 1995.

See also: 845 F.Supp. 155.

Parker Chapin Flattau & Klimpl, New York City (Stephen G. Rinehart, of counsel), for third-party plaintiffs.

Dorsey & Whitney, New York City (James V. Parravani, Richard L. Bond, of counsel), for third-party defendants NTS–Properties IV, NTS–Properties Associates IV, NTS–Properties V and NTS–Properties Associates V.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Third-party defendants NTS Properties IV ("NTS IV"), NTS Properties Associates IV, NTS Properties V ("NTS V"), and NTS Properties Associates V (collectively, "NTS") seek dismissal pursuant to Fed.R.Civ.Pro. 12(b)(6) of those portions of the Amended Third–Party Complaint that seek contribution from NTS. For the reasons set forth below, NTS's motion is denied.

### BACKGROUND

As part of an investment plan recommended to her by defendant Gary Goldberg, plaintiff Rose McCoy purchased 83 interests in NTS IV, a Kentucky limited partnership, for $85,000 on September 6, 1983 and 75 interests in NTS V, a Maryland limited partnership, for $75,000 on November 30, 1984. On December 8, 1989, after discovering that all of the investments that Goldberg had recommended to her were worth substantially less than she had believed, McCoy filed suit against Gary Goldberg and Gary Goldberg & Company, Inc. (collectively, "Goldberg"). This Court dismissed that complaint, and McCoy subsequently filed an amended complaint (the "Complaint") on November 27, 1990.

In it, she alleged that Goldberg, a Certified Financial Planner, solicited her to invest the proceeds of her deceased husband's life insurance policy in twelve different limited partnerships that dealt in real estate. McCoy claimed that this investment strategy was contrary to the low-risk, liquid investment program that she, a widow, sought from Goldberg in order to provide a secure income for herself and her children. The Complaint alleged claims under Rule 10b–5, promulgated under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

§ 78j(b); various sections of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.; and the common law of New York.

On January 28, 1991, Goldberg filed a third-party complaint against eleven of the twelve partnerships in which McCoy had invested, including NTS IV and NTS V. In October 1992, this Court severed the third-party claims from the underlying action pursuant to Fed.R.Civ.Pro. 42(b), and the underlying action was tried to a jury. The jury found for McCoy, awarding compensatory damages of $872,714. Because the jury completed a special verdict form, we know that it found Goldberg liable only for breach of his fiduciary duty to McCoy, and not for violations of Rule 10b–5, RICO, or common law fraud. This Court granted Goldberg's motion for remittitur and reduced the award to $579,677.85. While an appeal was pending, Goldberg paid McCoy $555,000 in settlement of all claims. Satisfaction of judgment was entered on April 9, 1993.

The third-party claims remained dormant until September 1993, when discovery and settlement negotiations began in earnest between Goldberg and the limited partnerships. On October 11, 1994, Goldberg filed an amended third-party complaint (the "Third–Party Complaint") seeking contribution from nine of the limited partnerships and their related entities, including NTS IV and NTS V.[1] On November 18, 1994, NTS filed the instant motion to dismiss those portions of the Third–Party Complaint that request contribution from NTS.

The Third–Party Complaint alleges that, in connection with the sale of 24,000 limited partnership interests at $1,000 each, NTS IV prepared and disseminated a Prospectus, dated August 1, 1983, and a Summary of Offering to brokers and to the public. NTS V also prepared and disseminated a similar Prospectus, dated August 1, 1984, and Summary of Offering in connection with the sale of 24,000 interests for $1,000 each. The Prospectuses and Summaries of Offering represented, *inter alia,* that NTS IV and NTS V were safe investments, offering tax benefits, a return of investment in four or five years, 8–12% income, liquidity and experienced management. Goldberg further alleges that John Nordstrom and Barry Farmer, both general partners of NTS Properties Associates IV[2] and NTS Properties Associates V,[3] made similar oral statements to Goldberg for the purpose of inducing him to become a Soliciting Dealer of NTS interests. Goldberg claims that Nordstrom and Farmer knew that these statements were false when they were made.

Furthermore, Goldberg alleges that, contrary to NTS's representations of experienced and professional management, Nordstrom and Farmer were enriching themselves at the expense of investors by, *inter alia,* misappropriating funds, improperly competing with NTS IV and NTS V, charging personal expenses to the partnerships, and making false statements about NTS IV and NTS V to brokers and to the public. Goldberg contends that in December 1984, Nordstrom and Farmer were forced to resign their executive positions with NTS Corp.,[4] although they retained their positions as general partners of NTS Properties Associates IV and NTS Properties Associates V.

---

1. Two of the headings in the Third–Party Complaint read "Count I—Contribution and Indemnification Against NTS IV" and "Count X—Contribution and Indemnification Against NTS V." In the body of the Third–Party Complaint and in his Memorandum in Opposition to NTS's motion, however, Goldberg clearly states that he seeks only contribution from NTS IV and NTS V. *See* Third–Party Complaint, ¶¶ 25, 147; Goldberg Opp. Mem., at 6 n. 4. Therefore, this opinion does not address NTS's arguments that Goldberg is not entitled to indemnification from NTS.

2. NTS Properties Associates IV, a Kentucky limited partnership, is the general partner of NTS IV.

3. NTS Properties Associates V, a Kentucky limited partnership, is the general partner of NTS V.

4. The Third–Party Complaint does not specify the relationship between NTS Corp. and the NTS entities involved in this action. Information contained in the Prospectuses reveals, however, that NTS Corp. is a general partner of both NTS Properties Associates IV and NTS Properties Associates V. Farmer, Nordstrom, and J.D. Nichols are also general partners of NTS Properties Associates IV and NTS Properties Associates V. *See* NTS IV Prospectus, at 12; NTS V Prospectus, at 15.

Despite NTS's representations to brokers and investors that the two men merely left to pursue other interests, NTS IV and NTS V subsequently filed suit against Nordstrom and Farmer for fraud, breach of fiduciary duty, conversion of assets, diversion of partnership opportunities, misappropriation of funds, and other common law causes of action. Goldberg claims that, as of the time that McCoy invested in NTS IV and NTS V, Nordstrom, Farmer and NTS knew of and failed to disclose Nordstrom and Farmer's misconduct.

Goldberg also claims that, as of the time that McCoy invested, NTS IV had failed to disclose that, in December 1983, NTS/Orlando Development Company ("NTS/Orlando") entered into an option agreement on a property in Florida as nominee, agent and trustee for the benefit of NTS IV. Goldberg alleges that J.D. Nichols, the Managing General Partner of NTS Properties Associates IV, caused that property to be conveyed to NTS/Orlando, in which he was the sole and controlling stockholder. Goldberg contends that this transaction was contrary to representations in the Prospectus, including representations that the managing general partner of NTS IV would exercise its judgment consistent with its fiduciary duty to NTS IV and that NTS IV funds would not be used to acquire property for any affiliated entity.

Goldberg also alleges that Nordstrom wrote and issued to him a series of press releases for NTS V that reiterated the representations made in the NTS V Prospectus and Summary of Offering regarding the strength of NTS V's real estate holdings, the income that investors could expect to receive, and the safety and liquidity of their investment.

Furthermore, Goldberg alleges that in recommending NTS IV and NTS V to McCoy he relied on the NTS IV and NTS V Prospectuses and Summaries of Offering and on the oral representations made by Nordstrom and Farmer. He contends that the statements that McCoy's Complaint alleged to be false—that NTS IV and NTS V were safe, liquid investments that would provide a steady, tax-sheltered income to McCoy— were expressly set forth in the information

that NTS provided to him and that he was, in effect, merely repeating to McCoy the statements made by NTS IV and NTS V. He also claims that he sent the Prospectuses and Summaries of Offering to McCoy before she invested. Goldberg alleges that he and McCoy were misled by NTS's intentional and/or negligent misstatements and omissions, and that NTS's acts were a proximate and contributing cause of the damages awarded to McCoy. Finally, Goldberg alleges that but for NTS's representations, which he relied on and repeated to McCoy, she would not have invested in NTS.

## DISCUSSION

 In evaluating NTS's motion to dismiss for failure to state a claim, this Court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). In order to prevail, the moving party must demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Anderson v. Coughlin*, 700 F.2d 37, 40 (2d Cir.1983). A court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Under New York law, "two or more persons who are subject to liability for damages for the same personal injury, ... may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought." N.Y.Civ.Prac.L. & R. § 1401. Courts have consistently read this statute expansively, interpreting it to apply "not only to joint tortfeasors, but also to concurrent, successive, independent, alternative, and even intentional tortfeasors." *Board of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 478, 517 N.E.2d 1360, 1364 (1987).

The critical requirement for a contribution claim under New York law is that "the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." *Nassau Roofing & Sheet Metal Co. v. Facilities Development Corp.*, 71 N.Y.2d 599, 528 N.Y.S.2d 516, 518, 523 N.E.2d 803, 805 (1988). Furthermore, "[a]n action over for contribution will not lie unless all of the essential elements of a cause of action against the proposed contributor can be made out." *Jordan v. Madison Leasing Co.*, 596 F.Supp. 707, 710 (S.D.N.Y.1984). NTS asserts that even if all of the allegations in the Third–Party Complaint are true, they are not are sufficient either to satisfy the same injury requirement or to establish all of the essential elements of any possible cause of action against NTS.

Before addressing NTS's arguments on these points, we must first dispose of a threshold issue. In her Complaint, McCoy alleged that Goldberg had made numerous material misstatements and omissions during his dealings with her. *See* Complaint, ¶¶ 29, 31(a), 31(k). The jury in the underlying action, however, found that Goldberg had made no material misstatements or omissions to McCoy. *See* Transcript of December 1, 1992, at 114–17. NTS points out that in the Third–Party Complaint, Goldberg describes McCoy's allegations and then states that NTS made each of those statements in its Prospectuses, Summaries of Offering, or oral conversations with Goldberg. *See* Third–Party Complaint, ¶¶ 20–21, 142–43. NTS asserts that because Goldberg argued successfully at the trial of McCoy's claims that his statements were not misleading, we should apply the doctrine of judicial estoppel to prevent him from arguing, in order to obtain contribution, that the same statements were misleading when made by NTS.

Judicial estoppel "allows a court to preclude a party from asserting a position contrary to one upon which it prevailed in a prior proceeding." *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1447 (S.D.N.Y.1986). The doctrine has been adopted in the Second Circuit, but used only rarely. *Loral Fairchild Corp.*

*v. Matsushita Electric Industrial Co.*, 840 F.Supp. 211, 219 (E.D.N.Y.1994). It "exists to protect the court, not a party, from [another] party's chicanery," *id.; see also Petition of Transrol Navegacao S.A.*, 782 F.Supp. 848, 852 (S.D.N.Y.1991), and applies "only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position," *Merill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis*, 903 F.2d 109, 114 (2d Cir.1990).

In this case, Goldberg certainly did not obtain a judgment in his favor in the underlying action as a result of his position. Although the special verdict form indicates that he convinced the jury that the statements alleged by McCoy were not sufficiently misleading to ground liability under Rule 10b–5 or for common law fraud, Goldberg had judgment entered against him in the amount of $579,677.85. Furthermore, we see no signs that Goldberg is attempting to play fast and loose with the judicial system by arguing that NTS made misleading statements and omissions to him about NTS IV and NTS V. The jury verdict in the underlying action dealt only with the question of whether Goldberg had made misleading statements to McCoy. *See* Transcript dated December 1, 1992, at 114–18. NTS was not a party to that proceeding and no question was presented to the jury regarding NTS's conduct or culpability, or whether Goldberg actually relied on the statements made by NTS. While we may have doubts about the likelihood that a jury will find NTS's statements to Goldberg and McCoy misleading when Goldberg was successful before in arguing that the same statements, when made by him to McCoy, were not misleading, we do not see any reason to exercise our equitable powers to prevent him from making that argument.

## I. Same Injury Requirement

In order to claim contribution from NTS, Goldberg must plead facts that demonstrate that his and NTS's actions contributed to the same injury to McCoy. *See Nassau Roofing*, 528 N.Y.S.2d at 518, 523 N.E.2d at 805. The jury's verdict on McCoy's claims is the basis for NTS's argument that the Third–Party Complaint fails to satisfy this

requirement. NTS asserts that because the jury found that Goldberg was not liable to McCoy under Rule 10b–5 or for common law fraud, the only injury that McCoy suffered was the breach of Goldberg's fiduciary duty to her. NTS contends that any misstatements or misleading omissions it might have made are unrelated to Goldberg's breach. Therefore, according to NTS, its actions did not contribute to McCoy's injury, and Goldberg's allegations cannot meet the same injury requirement.

This argument has a certain surface appeal. We do not, however, agree with its basic premise: that McCoy's injury is solely Goldberg's breach of his fiduciary duty to her. Instead, we believe that McCoy's injury, properly characterized, is the financial loss that she sustained because she invested in the partnerships. If NTS made material misstatements or misleading omissions that contributed to the financial losses that McCoy suffered because she invested in NTS IV and NTS V, then its actions contributed to the same injury that Goldberg's did. Goldberg must, of course, prove that was the case, but his allegations are sufficient to satisfy the same injury requirement at the pleading stage.

## II. Viability of Theories of NTS's Liability

■ To state a claim for contribution, Goldberg must also plead facts sufficient to establish each element of a cause of action under which NTS could be liable either to McCoy or to Goldberg.[5] *See Jordan,* 596 F.Supp. at 710. NTS correctly notes that the allegations in the Third–Party Complaint all concern some sort of fraudulent behavior on the part of NTS IV, NTS V, Nordstrom, Farmer and Nichols. As we read the Third–Party Complaint, therefore, Goldberg hinges his contribution claims primarily on the theories that NTS could be liable: 1) to McCoy for violating Rule 10b–5, 2) to McCoy for common law fraud, or 3) to Goldberg for negligent misrepresentation. NTS argues that Goldberg's allegations, even if true, are

insufficient to support liability under any of these theories.

Goldberg's factual contentions fall into two categories. First, he alleges that NTS made misrepresentations and material omissions regarding the risk of investment in and the potential for profit from NTS IV and NTS V. Second, he alleges that NTS failed to disclose misconduct by Nordstrom, Farmer and Nichols. For convenience sake, we will discuss the two groups of allegations separately. While all of Goldberg's allegations satisfy the same injury requirement, only the allegations of misconduct by Nordstrom and Farmer satisfy the requirement that Goldberg plead facts sufficient to demonstrate each element of a theory of liability against NTS. Accordingly, to the extent that Goldberg's contribution claims are predicated on other allegations, he has not stated a claim upon which relief may be granted.

### A. Allegations of Non–Disclosure of Risks of Investment

■ Goldberg has alleged that NTS knowingly made misrepresentations in its Prospectuses, in its Summaries of Offering and in conversations between Goldberg and NTS personnel concerning the safety, liquidity, and profitability of NTS IV and NTS V. NTS argues that these allegations cannot provide the basis for Goldberg's contribution claims because, in order to state a claim under Rule 10b–5, common law fraud or negligent misrepresentation, Goldberg must allege facts that show that his or McCoy's reliance on NTS's statements was justified. *See Brown v. E.F. Hutton Group,* 735 F.Supp. 1196, 1202 (S.D.N.Y.1990), *aff'd,* 991 F.2d 1020 (2d Cir.1993) (Rule 10b–5); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 971 (2d Cir.1987) (common law fraud); *Finkel v. Shearson Lehman Hutton Inc.,* N.Y.L.J., Dec. 20, 1994, at 27 (N.Y.Sup.Ct. Dec. 20, 1994) (negligent misrepresentation). NTS asserts, and we agree, that reliance on optimistic statements of safety, liquidity and

---

5. Liability for contribution may be predicated on the breach of a duty owed by the third-party defendant to the plaintiff in the underlying action or to the third-party plaintiff. *See Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 583

N.Y.S.2d 957, 966, 593 N.E.2d 1365, 1374 (1992); *Garrett v. Holiday Inns, Inc.,* 58 N.Y.2d 253, 460 N.Y.S.2d 774, 778, 447 N.E.2d 717, 721 (1983).

profitability in NTS's offering materials or in conversations between Goldberg and NTS personnel was, as a matter of law, not reasonable.

In *Brown v. E.F. Hutton Group*, the Court held that, as a matter of law, an investor could not justifiably rely on optimistic statements concerning the risk and profitability of an investment, whether made in a summary brochure or orally, when the "total mix of information" adequately disclosed the investment's riskiness. *See Brown*, 735 F.Supp. at 1200–02. The facts in *Brown* are strikingly similar to the situation in this case.[6] In both cases, the plaintiffs invested in aggressively marketed limited partnerships that subsequently lost substantial fractions of their value. In both cases, the offering materials contained summaries that painted a rosy picture of a low-risk investment that promised liquidity and substantial income yields, and these optimistic projections were repeated orally to the investors. In both cases, however, the summaries also included a clear direction that the reader should examine the prospectus for a full description of the investment. *See* NTS IV Summary of Offering, at 4, attached as Exhibit F to Affidavit of James V. Parravani dated November 18, 1994; NTS V Summary of Offering, at 4, attached as Exhibit G to Affidavit of James V. Parravani dated November 18, 1994; *Brown*, 735 F.Supp. at 1200.

The NTS IV and NTS V Prospectuses are replete with warnings that investing in the partnerships was risky.[7] For example, the first page of each NTS Prospectus cross-references for the reader the sections of the Prospectuses that elaborate on the risks of investment. The Prospectuses then disclose in detail the general risks of investing in real estate and the specific risks of investing in NTS IV and NTS V. The general risks discussed include downturns in the local economy or property values, competition from other developers, increased taxes, construction delays, energy and supply shortages, unanticipated environmental or zoning problems, and unavailability of funds to finance construction and operating costs. The specific risks disclosed include the absence, at that time, of a favorable ruling on the partnerships' tax status from the IRS; the possibility that the partnerships might invest all of their funds in one project; the fact that the partnerships did not, at that time, own any properties and, therefore, the limited partners would not have the opportunity to examine properties prior to purchasing interests in the partnerships; the possibility that the partnerships might borrow funds secured by the properties they did acquire; and the probable absence of a resale market for partnership shares. *See* NTS IV Prospectus, at 15–20, attached as Exhibit D to Affidavit of James V. Parravani dated November 18, 1994; NTS V Prospectus, at 18–25, attached as Exhibit E to Affidavit of James V. Parravani dated November 18, 1994. These explicit disclosures clearly "bespeak caution." *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986).

---

6. In *Brown*, the defendants made a motion to dismiss the plaintiffs' section 10(b) claims or, in the alternative, for summary judgment for defendants. The plaintiffs' complaint quoted only small snippets of the offering materials at issue in the case. Because the District Court did not, under those circumstances, believe that it could consider the offering materials in their entirety on a motion to dismiss, *see Brown*, 735 F.Supp. at 1199, it instead granted summary judgment for defendants. The Court found that "[w]hen viewing in isolation the statements relied upon by plaintiffs, this Court cannot say that, as a matter of law, they are not misleading. The picture is much different, though, when the Court considers the whole of the offering materials." *See id.*, at 1200.

Subsequently, the Second Circuit has held that a court may consider a prospectus in its entirety despite a plaintiff's failure to incorporate it into the complaint or even to quote from it extensively. *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991). Under current Second Circuit law, therefore, the District Court could have decided *Brown* on a motion to dismiss, after consideration of the complete offering materials. Hence, the difference in procedural posture between *Brown* and this case does not prevent us from treating the two situations as analogous.

7. Goldberg alleges that he received the Prospectuses from NTS and transmitted them to McCoy before she invested. He also alleges that he relied on statements in the Prospectuses in recommending NTS as a sound investment for McCoy. *See* Third–Party Complaint, ¶¶ 19, 141. Hence, Goldberg is not arguing that he and McCoy were unable to obtain copies of the Prospectuses or were unaware of their provisions.

Goldberg and McCoy were not free, under these circumstances, to ignore the warnings in the Prospectuses and to rely instead on the representations made in the Summaries of Offering and in Goldberg's conversations with NTS personnel.[8] As in *Brown,* "[n]o reasonable investor reviewing the disclosure documents could fail to appreciate that the Partnership[s] could result in a total loss." *See Brown,* 991 F.2d at 1033. Indeed, the Prospectuses explicitly state that "[n]o assurance can be given that [the investment] objectives will be attained or that the Partnership[s'] capital will not decrease." *See* NTS IV Prospectus, at 24; NTS V Prospectus, at 28.

Therefore, to the extent that Goldberg's contribution claims are based on his allegations of NTS's failure adequately to disclose the risk that NTS IV and NTS V might not prove to be safe, liquid, income-producing investments, he has not stated a claim upon which relief may be granted. Each possible theory of liability on which his contribution claims might be based requires that he prove justifiable reliance by himself or by McCoy; he has not alleged facts that would enable him to do so.

### B. Allegations of Non–Disclosure of Management Misconduct

Goldberg has also alleged that Nordstrom, Farmer and Nichols engaged in various forms of misconduct and that NTS's failure to disclose these activities contributed to McCoy's injury, entitling Goldberg to contribution from NTS. NTS counters that Goldberg has not alleged facts on which NTS could be found liable under either Rule 10b–5, common law fraud, or negligent misrepresentation, because, even if Goldberg's allegations were true, he could not establish scienter or justifiable reliance. NTS also argues that Goldberg's allegations of causation are insufficient to support a cause of action under Rule 10b–5 or for common law fraud. Finally, NTS contends that Goldberg has not alleged facts that could establish the special relationship between NTS and Goldberg that

is an essential element of an action for negligent misrepresentation. We find Goldberg's allegations of misconduct by Nordstrom and Farmer adequate to defeat this motion to dismiss, although his allegations of misconduct by Nichols are not.

#### 1. Scienter

 Relying on Rule 9(b), Fed.R.Civ. P., NTS argues that Goldberg has not alleged, with sufficient particularity, facts that demonstrate that NTS knew that Nordstrom and Farmer were enriching themselves at the expense of the partnerships because the Third–Party Complaint specifies no instances of undisclosed misconduct that occurred before McCoy purchased interests in NTS. The standard for pleading scienter is that "though it need not be plead with 'great specificity,' the facts alleged in the complaint must 'give[ ] rise to a 'strong inference' of fraudulent intent.'" *In Re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 268 (2d Cir.1993) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).

Taking into consideration that on this motion to dismiss we must view the allegations in the Third–Party Complaint in the light most favorable to Goldberg, we find that he has plead facts from which we can infer scienter. NTS IV offered its interests to the public on August 1, 1983; McCoy purchased her interests on September 6, 1983. The NTS V offering began on August 1, 1984, and McCoy bought her interests on November 30, 1984. Goldberg has alleged that both Nordstrom and Farmer were involved in the process of selling the partnership interests. *See* Third–Party Complaint, ¶¶ 12, 136, 138. Nordstrom and Farmer's dismissal from their positions at NTS Corp., the event to which Goldberg points as evidence of their misconduct, took place in December 1984. Subsequently, NTS IV and NTS V filed suit against Nordstrom and Farmer, based on allegations of extensive, ongoing misconduct, which are described by Goldberg in the Third–Party Complaint.

---

**8.** Nor can Goldberg demonstrate justifiable reliance, by himself or by McCoy, on the press statements that Nordstrom wrote on behalf of

NTS V. The optimism of these statements is clearly qualified by the disclosures in the Prospectuses.

From these allegations, we may infer that the partnerships had knowledge or were reckless in not knowing that Nordstrom and Farmer, both of whom were general partners of NTS Properties Associates IV and NTS Properties Associates V, were using partnership assets to enrich themselves. It is certainly possible that Goldberg can prove his allegation that Nordstrom and Farmer's misconduct began before McCoy bought her interests in NTS V, since her purchase occurred less than one month before Nordstrom and Farmer left NTS Corp. Goldberg may also be able to prove that the misconduct began before McCoy bought her interests in NTS IV. Indeed, if the allegations of misconduct prove to be true, it would not be surprising to discover that Nordstrom and Farmer were enriching themselves at the expense of the partnerships from their inception. In any event, the Third–Party Complaint raises a question of fact about whether Nordstrom and Farmer's alleged misconduct actually began before McCoy purchased her interests. That question cannot be resolved on a motion to dismiss.

■ On the other hand, Goldberg has alleged that J.D. Nichols, while acting as Managing General Partner of NTS Properties Associates IV, caused NTS/Orlando to purchase for itself certain property in Florida for which it had signed an option agreement in December 1983 as nominee, agent and trustee for the benefit of NTS IV. Goldberg contends that NTS's failure to disclose this transaction constituted securities and common law fraud because it rendered misleading various representations in the NTS IV Prospectus, most notably NTS's representation that the NTS Properties Associates IV would exercise its judgment consistent with its fiduciary duty to NTS IV. *See* Third–Party Complaint, ¶¶ 16–18. Goldberg therefore argues that he is entitled to contribution. We disagree.

With respect to this transaction, Goldberg has alleged no facts that would permit to us to infer scienter on the part of NTS. McCoy bought her interests in NTS IV on September 6, 1983. NTS/Orlando did not even enter into the option agreement on the Florida property until December 1983. The Third–

Party Complaint treats this as an isolated transaction: Goldberg does not allege that Nichols was involved in an ongoing course of dealing that included usurping partnership opportunities. Instead, the Third–Party Complaint merely states that NTS IV filed suit in September 1985 against Nichols, apparently solely on the basis of the NTS/Orlando transaction. Furthermore, Goldberg alleges only that NTS failed to disclose this transaction at the time that it occurred—three months after McCoy made her purchases. *See* Third–Party Complaint, ¶ 16. The Third–Party Complaint provides us with no basis for inferring that NTS knew or was reckless in not knowing, at the time of McCoy's purchase, that Nichols planned to divert the Florida property to NTS/Orlando. Therefore, to the extent that Goldberg's claims for contribution are based on NTS's alleged failure to disclose the NTS/Orlando transaction, they do not state a claim upon which relief may be granted.

### 2. Justifiable Reliance

■ Next, NTS argues that Goldberg has failed to allege facts that could demonstrate justifiable reliance on representations in NTS's offering materials that were rendered misleading by NTS's failure to disclose Nordstrom and Farmer's actions. We are not convinced by NTS's reasoning.

The Third–Party Complaint alleges that Nordstrom and Farmer's actions were contrary to NTS's representations that its management was experienced and professional. *See* Third–Party Complaint, ¶¶ 14, 139. In the Prospectuses, NTS represents that the general partners of NTS IV and NTS V are each "accountable to [the] limited partnership as a fiduciary and consequently must exercise good faith and integrity in handling partnership affairs." *See* NTS IV Prospectus, at 14; NTS V Prospectus, at 18. Furthermore, the Summaries of Offering paint an attractive picture of NTS's management, stating that investors should choose NTS because of its experience ("Since 1968, NTS has developed and built nearly half a billion dollars of real estate. . . ."), expertise ("NTS is a team of real estate professionals, specialists with years of experience. . . ."), and re-

sults ("NTS partnerships have always met or exceeded cash projections.") *See* NTS V Summary of Offering, at 2; *see also* NTS IV Summary of Offering, at 1, 4. The Prospectuses do warn investors of the likelihood that conflicts of interest will arise among the various entities in the NTS family. The Prospectuses represent, however, that any conflicts will be resolved consistent with the general partner's fiduciary duty to the limited partners and with the investment objectives of the partnerships. *See* NTS IV Prospectus, at 12–14; NTS V Prospectus, at 15–18. Those objectives include preserving and protecting the limited partners' capital. *See* NTS IV Prospectus, at 24; NTS V Prospectus, at 28.

Certainly, for obvious reasons, nothing in the Prospectuses or Summaries of Offering warns potential investors that Nordstrom and Farmer, acting in their capacity as the general partners of NTS Properties Associates IV and NTS Properties Associates V, might misappropriate funds, take kickbacks, convert assets, and usurp partnership opportunities. Investors and brokers could reasonably rely on NTS's representations that the partnerships would be properly managed. The Third–Party Complaint has therefore alleged facts that, if true, would satisfy the justifiable reliance element of a cause of action under Rule 10b–5, common law fraud or negligent misrepresentation.

### 3. Causation

NTS also argues that Goldberg has not alleged facts that would demonstrate that Nordstrom and Farmer's actions caused any injury to McCoy. NTS contends, therefore, that Goldberg is not entitled to contribution based on the theory that NTS could be liable to McCoy under Rule 10b–5 or for common law fraud.[9] NTS asserts that Goldberg's allegations of causation are insufficient in several respects. First, NTS raises a standing-type argument, asserting that Nordstrom

and Farmer's misconduct caused injury, at most, to the partnerships themselves rather than to McCoy. NTS then argues that Goldberg's contentions do not satisfy the loss causation requirement of Rule 10b–5 or the "direct and independent cause of injury" requirement of an action for common law fraud. If NTS is correct in any of these arguments, Goldberg's contribution claims would be deficient, because he would have failed to allege all of the elements of a cause of action against NTS. We find, however, that each of NTS's arguments is flawed.

NTS is correct that in many situations a limited partner may not bring suit on her own behalf when the defendant's actions injured only the partnership. *See Lenz v. Associated Inns & Restaurants Co.*, 833 F.Supp. 362, 380 (S.D.N.Y.1993) (dismissing breach of fiduciary duty action where limited partner damaged only to extent of diminution of stake in partnership); *Attick v. Valeria Assocs., L.P.*, 835 F.Supp. 103 (S.D.N.Y.1992) (dismissing RICO claims where only injury to limited partner is diminution of value of investment). Limited partners commonly sue on their own behalf, however, when the injury alleged is a violation of the securities laws or common law fraud. *See, e.g., Parnes v. Mast Property Investors, Inc.*, 776 F.Supp. 792, 795–97 (S.D.N.Y.1991) (denying motion to dismiss limited partner's securities fraud claims); *Friedman v. Arizona World Nurseries Ltd.*, 730 F.Supp. 521, 541 (S.D.N.Y. 1990) (denying motion to dismiss limited partners' securities and common law fraud claims), *aff'd*, 927 F.2d 594 (2d Cir.1991); *Thornock v. Kinderhill Corp.*, 712 F.Supp. 1123, 1127–28 (S.D.N.Y.1989) (same).

In those cases, and countless more like them, the limited partners have alleged direct injuries to themselves caused by the partnerships' fraudulent failure to disclose information that would have affected their investment decisions. Likewise, in this case, Goldberg is not merely alleging that Nordstrom and Farmer's actions diminished

9. Because Goldberg's securities and common law fraud theories focus on whether NTS could be held liable to McCoy, while Goldberg's argument with respect to negligent misrepresentation focuses on whether NTS could be held liable to Goldberg, none of the causation arguments discussed in this section applies to the negligent

misrepresentation theory. Since NTS does not otherwise attack Goldberg's allegations of causation, we assume, without deciding the issue, that Goldberg's allegations meet the requirements for pleading causation in an action for negligent misrepresentation.

the value of the partnership and therefore reduced the value of McCoy's investment. Instead, he is alleging that NTS's failure to disclose Nordstrom and Farmer's misconduct injured McCoy by misleading her in violation of Rule 10b–5 or common law fraud.[10] Hence, NTS's first argument is not persuasive.

Focusing next on the requirements for pleading causation under Rule 10b–5, we find that Goldberg has alleged facts that meet those standards. To state a claim, a party must allege both transaction causation and loss causation. Transaction causation "involves proof that the [third-party] defendants' misrepresentations and omissions caused the purchase of securities. Loss causation involves a showing that the misrepresentations and omissions proximately caused the economic harm." *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 243 n. 3 (S.D.N.Y.1988) (citing, *inter alia, Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986)). The Second Circuit has explained that when "the misrepresentation ... both induced the purchase [transaction causation] and related to the stock's value [loss causation], it could be deemed causally related to the loss." *Bennett,* 770 F.2d at 314.

Goldberg has alleged that but for the representations made by NTS IV and NTS V, including the representations of experienced and professional management, McCoy would not have purchased her interests in NTS IV and NTS V. *See* Third–Party Complaint, at ¶¶ 22(b), 144(b). We have no difficulty imagining that had McCoy been aware of Nordstrom and Farmer's alleged misconduct, she would not have chosen to invest in NTS. Goldberg has also alleged loss causation by claiming that "[p]laintiff's losses were proximately caused by Third–Party Defendants' representations and omissions." *See* Third–Party Complaint, at ¶¶ 22(b), 144(b). If Nordstrom and Farmer were in fact diverting business opportunities from the partnerships, charging lavish personal expenses and vacations to the partnerships and misappropriating funds, that behavior could no doubt be extensive enough to endanger the financial health of the partnerships and to result in a substantial decrease in the value of McCoy's interests. NTS's failure to disclose Nordstrom and Farmer's activities was therefore related to the value of the interests.

These allegations satisfy this Circuit's requirements for pleading causation under Rule 10b–5. *See Bruce v. Martin,* 691 F.Supp. 716, 726 (S.D.N.Y.1988). In resolving this motion, we need not opine on the likelihood that Goldberg can convince a jury that these allegations are true. Instead, we merely find that a jury could decide that NTS's failure to disclose the misconduct of its management both induced McCoy's purchases and related to the value of interests in NTS IV and NTS V.

Goldberg has also alleged facts sufficient to satisfy the causation element of a common law fraud theory of liability. Under New York law, a plaintiff must establish that "the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes." *See Revak v. SEC Realty Corp.,* 18 F.3d 81, 89–90 (2d Cir.1994). This formulation is essentially a statement of the loss causation element of an action for common law fraud. *See id.* NTS contends that the loss causation requirement for common law fraud is more stringent than that for Rule 10b–5. Even if NTS is correct on this score, however, the requirement is not so strict that Goldberg's allegations of causation are insufficient.

In making its argument, NTS attributes great, and in our view unwarranted, signifi-

---

10. Allegations of failure to disclose management misconduct can support a cause of action under Rule 10b–5 when the information concerning wrongdoing goes "directly to the financial condition of the company" or partnership. *Greenfield v. Professional Care, Inc.,* 677 F.Supp. 110, 113 (E.D.N.Y.1987).

While recognizing that it would be unworkable to require management to "direct conclusory accusations at itself or to characterize its behavior in a pejorative manner," courts have found that "[i]t does not follow, however, that defendants need not disclose facts showing that [the defendant]'s management or employees committed specific acts or permitted specific practices that an informed investor would consider as potentially endangering its future financial performance." *Ballan v. Wilfred American Educ. Corp.,* 720 F.Supp. 241, 249 (E.D.N.Y.1989).

cance to the phrase "independent of other causes." NTS asserts that

> Goldberg necessarily caused Rose McCoy's injury by breaching the special relationship of trust and confidence which he alone owed to her. Accordingly, to the extent his contribution claim against NTS is predicated on a theory of common law fraud, he is unable to prove that NTS's alleged omissions caused Mrs. McCoy's injuries *independent* of other causes.

NTS Mem., at 28. This argument fails in two respects. First, it characterizes McCoy's injury too narrowly. As we explained above in connection with the same injury requirement, McCoy's injury is the financial loss that she suffered when her investments declined in value, rather than the actual breach of Goldberg's fiduciary duty to her.

Second, even if we assume that NTS has properly identified the injury to McCoy, NTS's reasoning is flawed. NTS argues that it is impossible for Goldberg to satisfy the independent causation requirement of a common law fraud theory of liability because Goldberg is alleging that both his actions and NTS's actions caused McCoy's loss. If NTS were correct, no joint tortfeasor would ever be able to recover for contribution based on allegations of common law fraud.

Numerous courts have, however, recognized the right to contribution when the third-party plaintiff has alleged facts that, if proven, would establish that the third-party defendant participated in defrauding the plaintiff in the underlying action. *See, e.g., In Re Crazy Eddie Securities Litigation,* 802 F.Supp. 804, 815 (E.D.N.Y.1992) (denying summary judgment dismissing contribution claim against alleged joint tortfeasor based on common law fraud theory); *McCoy v. Goldberg,* 778 F.Supp. 201, 204 (S.D.N.Y.

1991) (denying motion to dismiss contribution claim brought by other third-party defendants in this case based on similar allegations of fraud); *Dep't of Economic Development v. Arthur Andersen & Co.,* 747 F.Supp. 922, 936 (S.D.N.Y.1990) (denying third-party defendants' motion to dismiss contribution claim based on underlying claim of common law fraud). Because a third-party plaintiff may recover contribution from a third-party defendant when both participated in defrauding the plaintiff, NTS's construction of the direct and independent cause requirement for an action of common law fraud cannot be correct.[11] Furthermore, because NTS's argument fails with respect to joint tortfeasors, it must also be incorrect when applied to concurrent, successive, independent, alternative, and intentional tortfeasors—all of which are entitled to contribution under New York law. *See Board of Educ.,* 523 N.Y.S.2d at 478, 517 N.E.2d at 1364. Therefore, we find that Goldberg's allegations concerning Nordstrom and Farmer's misconduct adequately plead causation under a common law fraud theory of liability.

Goldberg's allegations of misconduct by Nordstrom and Farmer, if proven, would establish NTS's liability under either a Rule 10b–5 or a common law fraud theory. Therefore, to the extent that Goldberg relies on these allegations in bringing his claims for contribution, we hold that he has stated a claim for which relief may be granted. Goldberg's allegations of misconduct by Nichols, however, fail adequately to plead scienter on the part of NTS, and therefore do not state a claim for contribution based on NTS's liability under Rule 10b–5, common law fraud, or negligent misrepresentation.

### 4. Special Relationship

Last, we turn to Goldberg's theory that he is entitled to contribution because NTS com-

---

11. NTS cites no cases that support its interpretation of the causation requirement for common law fraud. First, none of the cases on which NTS relies concerns common law fraud as the basis for a contribution claim. Second, although the cases that NTS cites dismiss common law fraud claims for lack of allegations of causation, they do so because the courts found insufficient allegations that the actions in question were the *direct* cause of the plaintiffs' injuries. None of these cases purports to dismiss a common law

fraud claim because the events in question were not the independent cause of the injuries. *See Revak,* 18 F.3d at 90 ("plaintiffs have not identified ... a loss that was the direct result of such changes"); *Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir.1993) (plaintiff "claims damage that is too remote"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Bennett,* 770 F.2d at 316 (plaintiffs' allegations of transaction causation insufficient to meet direct causation requirement of common law fraud).

mitted negligent misrepresentation. Because NTS does not specifically attack Goldberg's pleading of scienter, justifiable reliance and causation with respect to this theory of liability, we will assume for the purposes of this discussion that Goldberg has adequately alleged these elements of a cause of action for negligent misrepresentation. Some sort of special relationship of trust and confidence between the parties is, however, also required to ground liability for negligent misrepresentation. *See Banque Arabe et Internationale d'Investissement v. Maryland National Bank,* 819 F.Supp. 1282, 1293 (S.D.N.Y.1993). No such relationship appears to exist between a seller of securities and a member of the general investing public. *See Time Warner,* 9 F.3d at 271. Therefore, Goldberg does not argue that he is entitled to contribution based on NTS's liability to McCoy for negligent misrepresentation.

Goldberg does argue, however, that NTS could be liable for negligent misrepresentations or omissions that it made to him. Goldberg contends that the contracts that he signed with NTS establishing him as a Soliciting Dealer of NTS interests created a tie sufficiently close to satisfy the special relationship of a claim for negligent misrepresentation. *See* Goldberg Opp. Mem., at 21–23. NTS disagrees. Because we find that Goldberg has alleged facts sufficient to ground his contribution claims under a Rule 10b–5 or a common law fraud theory of liability, we need not rule at this time on the issue of whether the Soliciting Dealer arrangement in this case is a special relationship. We note, however, that an ordinary contractual relationship is often insufficient to establish a special relationship, *Banque Arabe,* 819 F.Supp. at 1293, while a continuing or potentially long-term contractual relationship may do so, *see Congress Financial Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 474 (S.D.N.Y.1992). Since the parties' treatment of this issue is quite brief, however, we cannot be certain at this time where the contractual relationship in this case falls along that spectrum.

NTS argues that since, in the Third–Party Complaint, Goldberg claims only that he was a "Soliciting Dealer" for NTS but does not specifically allege the existence of the Soliciting Dealer agreements, *see* NTS Reply Mem., at 19; Third–Party Complaint, ¶¶ 13, 137, Goldberg cannot rely on those contracts to claim that a special relationship exists. We note, however, that in its Counterclaims brought in response to the Third–Party Complaint, NTS itself alleges that Goldberg signed the Soliciting Dealer agreements and bases five of its six counterclaims on the terms of those agreements. *See* NTS's Amended Answer to Third–Party Complaint and Counterclaims, at 10–19. Under these circumstances, we find NTS's argument somewhat disinguous. Accordingly, we grant Goldberg permission to file, within two weeks, an amendment to the Third–Party Complaint alleging that Goldberg entered into a contractual Soliciting Dealer relationship with NTS.

## CONCLUSION

For the foregoing reasons, NTS's motion to dismiss Goldberg's contribution claims for failure to state a claim upon which relief may be granted is denied.

SO ORDERED.