Kay N. BROWN, et al., Plaintiffs,

v.

The E.F. HUTTON GROUP, et al., Defendants.

No. 89 Civ. 0611 (JMW).

United States District Court, S.D. New York.

March 8, 1990.

## OPINION AND ORDER

WALKER, Circuit Judge:[1]

Plaintiff investors charge defendants with fraudulent conduct in connection with the sale of interests in an oil and gas limited partnership. Defendants have moved to dismiss the amended complaint for failure to state a claim pursuant to Fed.R.Civ.P. ("Rule") 12(b)(6) and for failure to plead fraud with particularity pursuant to Rule 9(b), or in the alternative, for summary judgment pursuant to Rule 56(b). For the reasons discussed below, defendants' motions for summary judgment and for dismissal pursuant to Rule 9(b) are granted, the amended complaint is dismissed, and plaintiffs are given leave to replead in conformity with this opinion.

## I. BACKGROUND

Plaintiffs are investors in the Hutton/Indian Wells 1983 Energy Income Fund, Ltd. ("Partnership"), a limited partnership designed to produce income through the purchase and management of producing oil and gas properties. The Partnership has failed to produce any real profits, and plaintiffs have brought suit against the corporate parties allegedly responsible for organizing and promoting the Partnership and selling interests therein. Defendants include Hutton Energy Services II, Inc. ("Hutton Energy"), one of the co-general partners, E.F. Hutton & Co., Inc. ("EFH & Co."), The E.F. Hutton Group ("Hutton"), parent of Hutton Energy and EFH & Co., Shearson Lehman Hutton, Inc. ("Shear-

son")[2], recent acquiror of Hutton and its subsidiaries (collectively, the "Hutton defendants"), as well as the Partnership, Indian Wells Production Company ("IWPC"), the other co-general partner, and Indian Wells Oil Co. ("IWOC"), parent of IWPC (collectively, the "Indian Wells defendants").

In their amended complaint plaintiffs allege two violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"). Count one, asserted against Hutton only, alleges sale of "unsuitable" securities; count two, against all defendants, alleges fraud in the sale of securities. Plaintiffs also assert claims of common law fraud against all defendants and breach of fiduciary duty against Hutton. They assert that as a result of defendants' wrongful conduct plaintiffs' investments are now worthless, and consequently demand judgment in the amount of their investments, plus interest, consequential damages and costs. Additionally, plaintiffs claim they are entitled to an award of punitive damages against Hutton under the common law fraud count. The Hutton and Indian Wells defendants have separately moved to dismiss the amended complaint, or in the alternative, for summary judgment.[3]

The Partnership was allegedly organized and promoted by Hutton Energy, IWPC and IWOC, and was designed to acquire and operate previously developed oil and gas properties. Amended Complaint at ¶¶ 5, 30. Partnership units were marketed and sold by Hutton through EFH & Co. and its account executives, who disseminated information to potential investors. *Id.* at ¶¶ 5, 11–12. Plaintiffs purchased their interests during the latter part of 1983 through Hutton account executives, after having had conversations with the brokers

---

1. Sitting by designation.

2. Shearson's liability is premised solely upon its acquisition in January, 1988 of all of the obligations and liabilities of Hutton and its subsidiaries. Amended Complaint ¶¶ 5.4, 37.

3. Plaintiffs' original complaint included claims under RICO and Section 17(a) of the 1933 Act, as well as Exchange Act claims and common law claims. Defendants moved to dismiss the

complaint for failure to state a claim and failure to plead fraud with particularity. After a status conference at which the Court noted its belief that some of defendants' arguments had merit, the Court filed an order permitting the plaintiffs to file an amended complaint. The order also stated that if defendants made any motions with respect to the amended complaint, discovery would be stayed pending determination of such motions.

about their investment objectives and the Partnership. *Id.* at ¶¶ 4, 17. Plaintiffs allegedly conveyed to the account executives their interest in low-risk securities providing either income or capital appreciation. *Id.* at ¶ 4. The brokers allegedly told them that there was "low" risk or "no" risk. *Id.* In making their investment decisions, plaintiffs were provided with the written offering materials for the Partnership, including the Prospectus, a Supplement describing some of the initial acquisitions of producing properties made by the Partnership, and a Brochure highlighting certain aspects of the Partnership. *Id.* at ¶¶ 16, 17.

The goal of the Partnership, as represented by the account executives and in the offering materials, was the provision of regular cash distributions to the investors. That goal has never been realized, and plaintiffs to date have received either zero or minimal returns, and their investments are allegedly worthless. *Id.* at ¶¶ 27, 35, 38. Defendants, however, have had use of the money and have earned some return from it, via sales commissions to Hutton and EFH & Co. and management fees and other expenses to Hutton Energy, IWPC and IWOC. *Id.* at ¶¶ 29, 31; Plaintiffs' Brief at 5–6.

Plaintiffs' claims of fraud are based upon allegations that the written offering materials contained material misrepresentations and omissions of which defendants were aware or were reckless in not being aware. They allege that the materials represented that the investment would generate a steady income stream and was low risk, when in fact it was extremely risky, and indeed there was a virtual certainty that the investors would never recover anything more than their original investments. *Id.* at ¶ 18. Plaintiffs allege that the Partnership was "fatally flawed" because of the prevailing industry conditions: a clear downward trend in oil and gas prices and excessively high operating costs. *Id.* at ¶¶ 18, 20. Allegedly, oil and gas prices would have had to rise about 33 percent— to their historical highs of several years earlier—in order for the Partnership to produce the hoped-for profits, and because prices had been dropping for two years and

there was no indication of a change in that trend, the chance that the 33 percent rise would occur was practically zero. *Id.*

To support their claim that the offering materials represented the Partnership as low-risk and conservative plaintiffs point to statements in the Brochure that the Partnership featured "Regular Cash Distributions," "No Exploration Risk," and "Low Minimum Investment;" that the investment was one which "has been carefully structured to offer benefits that meet the needs of an income-oriented investor." *Id.* at ¶ 16.

They also point to as misleading representations in the Prospectus that the limited partners would receive an annual cash distribution of 15 percent of their investment; that the Partnership would reduce distributions to the general partners up to 50 percent in order to increase distributions to the limited partners to ensure them of receiving their 15 percent return per year; and that the Partnership was obligated, if asked, to repurchase up to $500,000 in units each year. *Id.* at ¶¶ 16, 18. Plaintiffs claim that these representations were designed to lull investors into a false sense of security and were misleading because investors would get these benefits only if enough money was available to trigger them, which would occur only in the unlikely event of a 33 percent oil and gas price rise.

Generally, they allege that the written materials are misleading and fraudulent because they either understate, obscure or omit discussion of the real risks of the investment. Defendants, of course, assert that none of these or any other statements are misleading and that there are no material omissions in the offering materials.

Plaintiffs assert that defendants either knew, or were reckless in not knowing, of the "fact" that the Partnership never had any realistic chance of producing profits and was in fact doomed to failure. They base this allegation on defendants' alleged knowledge of the industry and prior experience with similar oil and gas partnerships. *Id.* at ¶¶ 20, 38. Hutton in particular had

previously offered two oil and gas limited partnerships involving the acquisition of producing oil and gas properties. *Id.* at ¶ 38. Also, they cite defendants' own due diligence investigation into the planned operations of the Partnership as a basis of knowledge. *Id.* at ¶ 20.

Despite their supposed knowledge and expertise, defendants proceeded to distribute materials that were allegedly designed to lure investors looking for conservative investments and omitted mention of both the specific "fatal flaw" and the exceedingly speculative nature of the investment generally. *Id.* at ¶¶ 9, 15. Indeed, they assert that Hutton specifically targeted the Partnership to the elderly on fixed incomes and other unsophisticated investors who would be more easily fooled by the misrepresentations and omissions. *Id.* at ¶ 43. Plaintiffs actually allege an entire scheme to defraud investors of their money. *Id.* at ¶¶ 29, 36, 39, 40.

## II. DISCUSSION

Defendants have moved to dismiss the amended complaint for failure to state a claim and for failure to plead fraud with particularity, and in the alternative have moved for summary judgment. The Court believes that on a motion to dismiss it could not consider the written offering materials submitted by defendants' as exhibits in support of their motions.[4] For convenience the Court will assess plaintiffs' claims from the standpoint of summary judgment, always mindful, of course, that it can dismiss a claim as legally insufficient on the basis of the pleadings. Rule 9(b) also stands as an independent requirement of particularity addressed to the face of the pleadings.

In considering whether a claim is legally sufficient the Court must read the complaint very generously, taking the facts alleged as true and resolving all factual doubts in favor of the pleader. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *See also, Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987), citing, *Yoder v. Orthomolecular Nutrition Institute*, 751 F.2d 555, 558 (2d Cir.1985). In considering a motion for summary judgment the Court must decide whether there are genuine issues of material fact requiring a trial, or whether one side is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). A genuine issue exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment the Court must look beyond the face of the complaint, considering all pleadings, memoranda, affidavits and other materials submitted by the parties. Fed.R.Civ.P. 56(c).

### A. Section 10(b) Claims

■ To state a claim for fraud under Section 10(b) plaintiffs must allege (1) material misstatements or omissions, (2) indicating an intent to deceive or defraud ("scienter"), (3) in connection with the sale or purchase of any security, (4) upon which the plaintiffs reasonably relied to their detriment. *See Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986); *Feinman v. Schulman Berlin & Davis*, 677 F.Supp. 168, 170–71 (S.D.N.Y.1988).

Plaintiffs have asserted two separate claims under 10(b) of the Exchange Act: "unsuitability" of the investment for these plaintiffs, and fraud in the sale of the units. Aside from the limitation of the first claim to Hutton, these two claims substantially overlap, both in the factual bases alleged and as a matter of logic, because they are both based on fraud. And as evidenced by the parties' briefs, the legal arguments under each count substan-

---

4. A motion to dismiss is addressed to the face of the pleading, which is deemed to include any document attached to it as an exhibit, Fed.R. Civ.P. 10(c), or any document incorporated in it by reference. *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir.1985). Though plaintiffs do include several quotations from the written offering materials in the amended complaint, the Court believes that the quotation was not substantial enough to constitute incorporation by reference of the written materials. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); *Goldman,* 754 F.2d at 1066. *But see, Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170 n. 3 (S.D.N.Y.1988).

tially overlap. Thus this Court believes that there is no meaningful distinction between the two claims for purposes of assessing the legal issues raised by defendants' motions. In its discussion below the Court will treat the amended complaint as if there were only one claim under Section 10(b).

Notwithstanding the Court's treatment of the two Section 10(b) counts as one, the Court believes that in substance plaintiffs are trying to allege two types of fraud that do require separate consideration by this Court. Plaintiffs' fraud allegations can be meaningfully divided into two groups: those asserting that defendants misrepresented the investment as low risk when they knew or should have known it was not, and those asserting that they knew that the Partnership had absolutely no chance of producing profits and was really an economic sham. The former group is the general, standard misrepresentation claim; the latter is a further charge of a conscious scheme to defraud investors. The Court will consider each claim in turn.

### 1. Misrepresentation of Risks in Offering Materials

■ To the extent that the amended complaint alleges the standard misrepresentation claim, this Court concludes that though it states a legally sufficient claim, it cannot withstand a motion for summary judgment. When viewing in isolation the statements relied upon by plaintiffs, this Court cannot say that, as a matter of law, they are not misleading. The picture is much different, though, when the Court considers the whole of the offering materials.

Despite the existence of the statements pointed to by plaintiffs, the Court concludes that the offering materials taken as a whole "bespeak caution" and sufficiently disclose the relevant risks of the investment. Thus with regard to the standard misrepresentation claim, the Court concludes that the offering materials are not misleading as a matter of law, or, to the same effect, that plaintiffs' reliance on certain portions of the materials was not reasonable as a matter of law. Summary

judgment for defendants is therefore appropriate on this claim.

The Brochure was contained in a "jacket," which on the inside cover contained the warning that:

> The use of this material is authorized only when preceded or accompanied by [the Prospectus]. Prospective investors are encouraged to read the prospectus, including the section entitled "Risk Factors."

In its description of the benefits of the investment, the Brochure referenced the appropriate sections of the Prospectus for fuller explanations.

On the first page of the Prospectus it is stated that, "THIS OFFERING INVOLVES CERTAIN RISKS. See 'RISK FACTORS'." Under the "RISK FACTORS" section there is a description of "Risks inherent in Oil and Gas Operations":

> There can be no assurance that properties selected will produce oil or gas in the quantities or at the cost anticipated, or that they will not cease producing entirely, and assumptions concerning the prices at which oil and gas will sell in the future may prove incorrect. In the event that oil and gas prices fall or do not rise, profit potential may be limited. Oil prices and the price of certain categories of natural gas declined over the past two years.

Following this was a description of the "highly competitive" nature of the oil and gas industry and the great degree of regulation and potential for operating and environmental hazards, all of which could impact profitability. Later, in describing acquisition of investment properties, the Prospectus stated that, "there is a risk that estimates of future prices or costs, reserves, production rates or other criteria upon which decisions are based may prove to be inaccurate."

In a section about the limited experience of the general partners in oil and gas ventures, there was a warning that, "[s]ince the General Partners have only limited experience in [identifying and acquiring producing properties], there can be no assur-

ance that the Partnership will be able to acquire Producing Properties on a timely or profitable basis."

Further, plaintiffs' claims of misleading "promises" made to lure investors are without merit, as it is abundantly clear from the materials that such statements were not guarantees but only goals. In a section entitled "Limited Liquidity," the Prospectus stated that, "[t]here will be no ready market for the Units.... There can be no assurance that the Partnership will have the financial resources to honor its repurchase commitments." Similarly, the materials never purported to "guarantee" regular distributions of 15% per year, as plaintiffs suggest (Amended Complaint at ¶ 16); the clear implication was that the Partnership *hoped* that such results would obtain. Moreover, though certain statements in the Brochure were clearly designed to attract investors—"No Exploration Risk", "Low Minimum Investment"— such statements were true and the Court concludes that, when viewed in light of the whole of the offering materials, they are not misleading as a matter of law.

Finally, the Supplement contained a chart of cash flow projections under both a level price scenario and a 6% annual rate of escalation scenario. Immediately following are a series of caveats that are thorough to the point of redundancy in their qualification of the projections:

The actual amount and timing of the distributions received by Limited Partners may differ significantly from those indicated above. Among the factors which may affect the ... distributions ... are fluctuations in oil and gas production costs and oil and gas prices.... There can be no assurance that the Partnership will be able to acquire additional Producing Properties comparable to [those] described in this Supplement.... Estimates of economically recoverable oil and gas reserves and of the future net revenues therefrom are based on a number of variable factors and assumptions, such as historical production of the properties ..., the assumed effects of regulation ... and assumptions concerning future oil and gas prices and future operat-

ing costs.... All such estimates are to some degree speculative.... [E]stimates of the economically recoverable reserves of oil and gas ..., the classification of such reserves and estimates of the future net revenues ... may vary considerably.

In sum, the offering materials are replete with statements emphasizing the speculative nature of the investment. Anyone who had taken even a cursory glance at the Prospectus and Supplement would have been alerted to the many risks and uncertainties inherent in the investment. Thus the written offering materials given to plaintiffs are not misleading within the meaning of Section 10(b).

A prospectus that "bespeaks caution" will not support an allegation of misrepresentation under Section 10(b). *See Luce*, 802 F.2d at 56. When an "offering memorandum ... unequivocally warns potential investors of the risks involved with investing in the limited partnership," Section 10(b) liability will not lie. *Feinman*, 677 F.Supp. at 171; *Luce*, 802 F.2d at 56 (no Section 10(b) claim stated since offering memorandum "made it quite clear that its projections of potential cash and tax benefits [were] 'necessarily speculative in nature'"). The securities laws' policy of "full disclosure", *see*, *Santa Fe Industries v. Green*, 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977), has been met when the relevant documents fully disclose the risks involved. *See Feinman, id.* at 170.

It is true that the Brochure highlighted the hoped-for benefits of the Partnership and did not stress the risks. But it does not, as plaintiffs contend, suggest a conservative investment, and it clearly directed the reader to consult the Prospectus for full information. In evaluating whether a statement is misleading under the federal securities laws, a court must consider the total mix of information possessed by the investors. *See Diamond v. Arend*, 649 F.Supp. 408, 415 (S.D.N.Y.1986) (claim of fraud in tender offer materials under Section 14(e)); *Basic Inc. v. Levinson*, 485

U.S. 224, 230–32, 108 S.Ct. 978, 982–83, 99 L.Ed.2d 194 (1988) (standard for material misrepresentation under Section 10(b) same as under Section 14).

Thus any reader who relied on the Brochure to conclude that the Partnership was low-risk did so unreasonably. "Reliance on statements which are directly contradicted by the clear language of the offering memorandum through which plaintiffs purchased their securities cannot be a basis for a federal securities fraud claim." *Feinman, id.* at 170, citing, *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 804–05 (1st Cir.1987) (affirming summary judgment for defendants because offering memorandum's candid warnings made any reliance unjustified as a matter of law). Moreover, all investors, no matter how "unsophisticated", would know or at least suspect that there would be risks associated with an oil and gas investment at that time, given the much-publicized downward trend in the industry.

These same considerations would apply to the alleged oral representations by Hutton account executives that the investment was low-risk. Any investor who relied on those statements, which flew in the face of the numerous cautionary statements in the written offering materials, clearly did so unreasonably. Moreover, any reasonable investor knows to be somewhat wary of a selling agent's oral representations and to check them against the written materials. Indeed, such statements are well recognized as merely nonactionable "puffing" on the part of salesmen. *See Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262, 264 (S.D.N.Y.1988); *Center Sav. & Loan Ass'n v. Prudential–Bache Securities,* 679 F.Supp. 274, 277 (S.D.N.Y.1987).

Any reader who relied on the escalated price scenario projections was clearly unreasonable in light of the level price scenario in the adjacent column and the slew of warnings accompanying the chart. Moreover, faulty economic projections alone will not support a Section 10(b) claim. *See Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 117 (2d Cir.1982); *Boley v. Pineloch Associates,* 700 F.Supp. 673, 679 (S.D.N.Y.

1988); *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 668 (S.D.N.Y. 1987).

### 2. Knowledge of Economic Sham

■ Plaintiffs, however, have also alleged that defendants specifically knew that the Partnership was a sham and would never earn profits, and were engaged in a scheme to defraud investors. On its face, this allegation seems sufficient to state a claim for fraud. If it is true, then no amount of risk disclosure in the offering materials would be adequate to avoid liability, as any representation of the Partnership as a legitimate investment, even a risky one, would be a misrepresentation. But there are problems with this allegation, problems which cast doubts on plaintiffs' ability to satisfy the particularity requirement for pleading fraud under Rule 9(b). It is unclear how the plaintiffs would ever be able to prove the "fact" that there was absolutely no chance of economic success for the partnership, or how they would prove that the defendants had knowledge of such fact. Plaintiffs would have severe difficulty in demonstrating the specific misrepresentation or omission, and defendants' scienter regarding it.

As the complaint currently stands, plaintiffs allege that prevailing economic conditions and trends *dictated* that there was but an infinitesimal chance that prices would rise so as to allow for reasonable economic profits. But given the nature of prices in a market economy, such an assertion is simply not capable of legal "proof". With domestic oil and gas prices so dependent on world supply and demand, and with the often volatile history of the industry in the 1970s, there is no way it could be shown with any degree of certainty that this partnership was going to fail, or that anyone should have known that it would fail. Even if plaintiffs' complaint could be construed as alleging that defendants would or should have known that there was a *likelihood* that the investment would fail, these same considerations would apply to make such an assertion incapable of proof.

Absent some showing of a specific flaw peculiar to this partnership, such as known

problems with certain properties, or some specific economic facts known only to one of the defendants and not to the rest of the market, plaintiffs cannot prevail as a matter of law. Their general assertions regarding prevailing economic trends and conditions simply cannot suffice to prove the "fact" of certain failure, or defendants' knowledge thereof. As a matter of pleading, Rule 9(b) requires that fraud be pled with particularity; the complaint as currently written does not pass muster under the relevant standards and therefore must be dismissed.

Rule 9(b) requires that,

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The rule serves several important purposes in securities fraud cases: it ensures that a defendant will be informed of the actions upon which the allegations of fraud are based; it acts to protect a defendant's reputation by preventing a plaintiff from baldly alleging fraud; and it helps prevent strike suits. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *DiVittorio v. Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir.1987); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). *See also, Segal v. Gordon*, 467 F.2d 602, 606–08 (2d Cir.1972). But courts cannot require too precise a form of pleading from plaintiffs, as Rule 8 and the spirit behind the Federal Rules generally requires that pleadings be simple and construed liberally. *See* Fed.R.Civ.P. 8; *Ross*, 607 F.2d at 557 n. 20; *Eickhorst v. American Completion and Development*, 706 F.Supp. 1087, 1091 (S.D.N.Y.1989).

For liability to attach under Section 10(b) the plaintiff must plead and prove scienter on the part of defendants. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) ("[Section] 10(b) was intended to proscribe knowing or intentional misconduct"); *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961–62 (2d Cir.1987); *Luce v. Edelstein*, 802 F.2d 49, 55; *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982); *Ross v. A.H. Robins*, 607 F.2d 545, 555–56. Indeed, a showing of scienter is so important in federal securities fraud actions that courts have required a plaintiff to allege facts that support a "strong inference" of knowledge on the part of defendants. *Cosmas v. Hassett*, 886 F.2d 8, 12–13 (2d Cir.1989); *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (in banc); *Devaney v. Chester*, 813 F.2d 566, 568–69 (2d Cir.1987); *Connecticut Nat'l Bank*, 808 F.2d at 962; *Ross*, 607 F.2d at 558.

Although Rule 9(b) allows knowledge and state of mind to be averred more generally, this Circuit has held that a plaintiff must still provide in his complaint specific facts which support this strong inference of knowledge. *Cosmas v. Hassett, id.; DiVittorio v. Equidyne Extractive Industries*, 822 F.2d 1242, 1248 (2d Cir.1987); *Beck*, 820 F.2d at 50; *Devaney*, 813 F.2d at 568; *Connecticut Nat'l Bank*, 808 F.2d at 962 ("plaintiffs [have] the[ ] burden of pleading circumstances that provide at least a minimal factual basis" which gives rise to a strong inference of scienter); *Ross*, 607 F.2d at 558.

Under these standards plaintiffs have not pled fraud regarding the "fatal flaw" with sufficient particularity. Their allegations regarding prevailing economic conditions are plainly insufficient to demonstrate any "fact" which defendants misrepresented or omitted, especially not the "fact" that the partnership would definitely or was likely to fail. As discussed above, the circumstances alleged by plaintiff cannot establish any "fact" regarding the prospects of success for the partnership. And these allegations are also not sufficient to provide even a minimal factual basis supporting a strong inference of scienter. The economic circumstances pointed to by plaintiff are just not sufficient to give rise to an inference that the

defendants *knew* that the partnership would or was likely to fail.

Plaintiffs' allegations here really boil down to charges of bad faith and wicked motives: that defendants knew that the investment would fail and wanted that result so that they could benefit through fees and use of the money.[5] But such claims could be made in *any* failed investment case, and simply alleging bad faith clearly cannot suffice under 9(b). Moreover, recitals of general economic conditions will not suffice as factual support for the alleged bad faith.

Plaintiffs try to rely on Hutton's alleged experience with oil and gas limited partnerships, knowledge of the industry generally, and due diligence inquiry into the Partnership, as a basis for defendants' scienter.[6] Plaintiffs allege that IWOC, Hutton and its affiliates previously engaged in several similar limited partnership ventures, including two recent ones involving producing oil and gas properties like the current one. Plaintiffs are asserting that because of this knowledge and experience, defendants would understand the structure and limitations of the oil and gas industry at the time, including the downward trend in prices, and would know that the Partnership had no chance of succeeding.

The court is aware that in some cases allegations of experience or stature of defendants are sufficient to support a strong inference that they knew or should have know some fact. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989) (allegations that certain foreign import restrictions would eliminate significant source of income for company, and that defendants were directors of company, formed sufficient factual basis for inference that defendants knew of import restrictions); *Goldman v. Belden,* 754 F.2d 1059, 1070 (2d Cir.1985) (defendants' public statements and self-portrayals as industry-wise businessmen sufficient factual basis for attributing knowledge that prospects were dim for company's key product).

But in those cases, unlike here, the fact at issue was reasonably susceptible of being known. The inferential leap from circumstances to knowledge of "fact" is far greater here than in those cases and, indeed, impossible to make. *Cf. Blanchard v. Katz,* 705 F.Supp. 1011, 1012–13 (S.D.N.Y.1989) (allegations that, because defendants were experienced in real estate they "had to know" that flat roofs would leak, and because they were familiar with the market they "had to know" that income projections were too high, were insufficient).

It is conceivable that plaintiffs could allege some more specific fact or set of circumstances that would support their allegation of impossibility of success. They make a superficial attempt in the amended complaint to do so when they assert that,

as a result of the high ratio of production costs that necessarily would be *paid* by the Partnership as compared to the revenues that could be *earned* by the Partnership, it would take most of the best production years of the Partnership's fields to generate enough cash flow just to allow the limited partners to recoup their initial investment and that, as a consequence, the increasing natural production decline in the Partnership's fields would coincide with the period when the Partnership was at last in a position to begin showing a profit from its fields

---

5. Plaintiffs' argument regarding motive and opportunity to defraud is in itself rather flimsy. Though certain of the defendants stood to make some money through fees and had the benefit of the use of the money, the defendant general partners had their own money at risk in the investment. Plaintiff makes no attempt to show that the defendants, or any of them, actually made a *net* gain from the investment.

6. Plaintiffs also assert as bases for knowledge Hutton's alleged pattern of offering similar limited partnerships during the early 1980s, its alleged efforts to market them to small and unsophisticated investors, and its alleged disregard for representations made by the plaintiffs that they wanted low-risk, income-producing investments. Such "facts" clearly have no rational *connection with defendants' knowledge of the* "fatal flaw" underlying this Partnership, let alone enough to support a strong inference of knowledge. While such allegations would support charges of widespread fraud once scienter were established, they do not support allegations of scienter in the first instance.

thereby severely limiting or eliminating the profit potential for the Partnership. Amended Complaint at ¶ 18(f). But clearly this is just a dressed-up version of their general allegation that economic circumstances dictated that the partnership never had any chance of success. For their "fatal flaw" claim to satisfy Rule 9(b), plaintiffs would have to allege some specific facts which were known to defendants and which would *conclusively* establish that the partnership was doomed. Specific problems known to defendants regarding particular properties, or specific economic/market facts known to defendants and not the rest of the market, might suffice.

Because of this possibility, the Court will grant plaintiffs leave to replead in order to allege some such specific, *conclusive* facts. But the Court wishes to emphasize that it has serious doubts regarding plaintiffs' ability to plead such facts. Plaintiffs have submitted their complaint twice already and have not yet come close to alleging the sort of damning facts to which the Court is referring here. Plaintiffs are hereby warned not to replead unless they can satisfy this requirement of conclusiveness. Should they choose to replead and fail to make sufficient allegations, this Court will entertain a motion by defendants for sanctions. Also, plaintiffs may replead *only* with respect to the allegations discussed in this section of the opinion.

### B. Common Law Claims

Under principles of pendant jurisdiction, plaintiffs also assert common law claims for fraud and breach of fiduciary duty. Because the court is dismissing the federal claims before trial or discovery, the state law claims also must be dismissed. If plaintiffs choose to replead their federal fraud claims consistent with this opinion, they may then include state law claims based on the same set of relevant facts.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment and for dismissal pursuant to Rule 9(b) are granted, the amended complaint is dismissed, but plaintiffs are granted leave to replead in conformity with this opinion within 30 days from the date of its entry.

SO ORDERED.