EMERGENT CAPITAL INVESTMENT MANAGEMENT, LLC, Plaintiff,

v.

STONEPATH GROUP, INC. (previously known as Net Value Holdings, Inc.), Andrew Panzo, and Less Hansen, Defendants.

No. 00 CV 7723 (RWS).

United States District Court, S.D. New York.

Oct. 2, 2001.

Heller, Horowitz & Feit by Martin Stein, New York City, for Plaintiff.

Kasowitz, Benson, Torres & Friedman by James J. Stricker, New York City, Klehr, Harrison, Harvey, Branzburg & Ellers by Richard M. Beck, Philadelphia, PA, for Defendants.

## OPINION

SWEET, District Judge.

Defendants Stonepath Group, Inc. ("Stonepath"), previously known as Net Value

Holdings, Inc. ("NETV"), Andrew Panzo ("Panzo") and Lee Hansen ("Hansen"), have moved pursuant to Rule 56, Fed. R.Civ.P., for summary judgment to dismiss the complaint of plaintiff Emergent Capital Investment Management, LLC ("Emergent") in action 00 Civ. 7723 (the "Initial Action"). The defendants have also moved under Rule 12(b)6 to dismiss the first amended complaint filed by Emergent in a related action, 01 Civ. 3936 (the "Second Action") and Emergent has moved pursuant to Rule 42(a), Fed.R.Civ.P., to consolidate the initial action and the Second Action. For the reasons set forth below, the motions to dismiss and the motion to consolidate are granted.

This is a hard case because the E-commerce bubble blew up in the face of these investors, as it did with many others [1] and the defendants assisted in creating the bubble. However, the theories advanced by Emergent do not successfully overcome the market forces which caused the loss of their investment.

### Prior Proceedings

On October 12, 2000, Emergent filed its complaint alleging a violation of Section 12 of the Securities Act of 1933 (First Claim for Relief), Rule 10(b)5 (Second Claim for Relief), section 20 of the Securities & Exchange Act of 1934 (Third Claim for Relief), common law fraud (Fourth Claim for Relief), negligent misrepresentation (Fifth Claim for Relief) and rescission (Sixth Claim for Relief) arising out of the purchase of NETV Series C convertible Preferred Stock (the "Stock") in March 2000 in a private placement of 166,667 shares undertaken by Emergent on the representation (alleged by Emergent) that the amount to be raised by the private placement of the stock was $20 million. Answers

to the complaint were filed and discovery undertaken.

The defendants' motion was heard and marked fully submitted on June 13, 2001.

On May 9, 2001, Emergent filed the Second Action, alleging a violation of 10(b)5 arising out of a misrepresentation of an investment by Stonepath in Brightstreet.com, Inc. ("Brightstreet"). A first amended complaint was filed by Emergent on June 5, 2001, alleging the omission to set forth material facts relating to prior activities and associations of Panzo alleged to constitute a pattern of "pump and dump," as well as control of Stonepath by Howard Appel ("Appel") who had been barred from the securities industry by the National Association of Security Dealers ("NASD").

On June 20, 2001, Emergent moved to consolidate both actions. On July 9, 2001, the defendants in the Second Action moved pursuant to Rule 12(b)6 to dismiss the first amended complaint. Both of these motions were marked fully submitted on August 15, 2001.

### The Facts

The facts as set forth below are taken from the parties' Local Rule 56.1 Statements and supporting affidavits with every inference favoring Emergent, the non-moving party, *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)), and the first amended complaint which is for Rule 12(b)6 purposes accepted as true. In a hopeful effort to improve clarity, the facts on which the motion for summary judgment turns, relating to purchase of the

---

**1.** *See* Greg Ip, *Deja Vu: Nasdaq Falls to Year-Ago Levels*, Wall Street Journal, Nov. 24, 2000, C1.

Stock and the amount of the offering, will be set forth first, followed by the allegations concerning the relationships, omissions and misrepresentations, which are the subject of the Rule 12(b)6 motion to dismiss the first amended complaint in the Second Action.

### The Parties

Emergent is a Delaware limited liability company that manages an investment fund. Ninety percent of Emergent's stock is owned by its two principals, Mark Waldron ("Waldron") and Daniel Yun ("Yun") who share the title of "Managing Member" or "Managing Partner" of Emergent.

Waldron and Yun had been employed by prominent Wall Street firms and were familiar with the securities market and private placements. Between January and March 2000, Emergent managed investments of between $5 and $7 million.

Stonepath is a Delaware corporation which as a start-up venture sought to provide services and capital investment to technology related businesses which had no history of profit but performed well. In early 2000, Stonepath was doing business as NETV and had acquired interests of a series of "portfolio" internet companies and sought to raise funds to execute its business plan. Panzo was chairman and chief executive officer of Stonepath and Hansen was the president and chief operating officer of NETV and a friend and former roommate of Waldron.

### The Offering

The initial contact between Emergent and Stonepath occurred on January 20, 2000, at a meeting in Emergent's offices in New York where Stonepath representatives in attendance at the meeting stated that they were "seeking approximately $20 million in capital" in a private placement which would be memorialized by a written agreement or series of agreements. In February conversations it was suggested to Waldron that the size of the offering was contemplated to be between $20 and $25 million. No further representation, written or oral, was made as to the size of the offering, but Yun expected that the size of the transaction would be disclosed in the contract of purchase.

Prior to purchasing the Stock, Emergent reviewed a registration statement on Form S–1 which Stonepath filed with the Securities and Exchange Commission ("SEC") on February 7, 2000 in connection with the registration of other securities which had been previously issued by the company. This statement revealed a substantial accumulated deficit, no revenue, and its auditor's doubt about its ability to continue as a going concern.

Emergent received and reviewed a written term sheet generally outlining the terms and conditions of the proposed transaction. On February 22, 2000, Waldron executed a letter of intent to participate in a private placement with an investment of $2 million with the term sheet attached as an exhibit and returned it to Stonepath. A portion of the term sheet referred to an offering of not less than $20 million. A draft of the Stock Purchase Agreement was transmitted to Emergent by e-mail on March 1, 2000. No additional documents were requested by Emergent.

Emergent received a signature page for the final Stock Purchase Agreement on March 3, 2000 (the "Agreement"), which was not accompanied by the full document, but the signature page was executed by Waldron and Emergent funded the stock purchase by a $2 million payment for 166,-667 shares of the Stock at a price of $12 per share. The amount of the offering was not contained in any writing but Emergent anticipated that the final written documents would incorporate the size of the offering.

After closing on the transaction, Emergent received a closing binder containing copies of the fully executed documents in the private placement which revealed that more investors were involved in the transaction than Waldron had anticipated and that the amount of the private placement was approximately $50 million. The Agreement contained an integration clause as follows:

This letter and the Letter Agreement and Summary of Terms annexed hereto sets forth the principal understanding of Emergent and the Company with respect to the Investment and is subject to the execution of definitive agreements by the parties participating in the Investment and the satisfactory completion of Emergent's due diligence examination of the Company.

Emergent sought out new business ventures with Stonepath after learning of the amount of the private placement. Following the purchase by Emergent of $2 million in NETV stock in early March 2000, the price of NETV shares fell below $1. On July 10, 2000, Emergent wrote to defendants demanding rescission.

### Additional Alleged Misrepresentations and Omissions

At the January 20 meeting, Panzo and Hansen also orally represented to Waldron and Yun that to date NETV had invested approximately $17 million in seven e-commerce companies. They represented that of the seven, the largest investment by far was $14 million which NETV had paid for a 12% equity interest in Brightstreet.

Panzo and Hansen gave Waldron and Yun a document entitled *Net Value Holdings, Smart Seed Capital* (the "Brochure") which listed the seven companies in which NETV had made investments. In the Brochure, NETV's investment in Brightstreet for which it allegedly received a 12% ownership interest, was represented to be $14 million.

In or about April 2001, during the course of discovery in 00 Civ. 7723, Emergent learned that while the representations made by defendants as to what NETV had paid for its equity investment in six of the companies was accurate, NETV's investment in (and payment to) Brightstreet was $4 million or less, and not $14 million as represented by defendants.

In its 1999 Form 10–K, filed on May 11, 2000, NETV stated that "the amount of capital stock purchased" by NETV in Brightstreet was "$4,000,000" and not $14 million. Similarly in its 2000 Form 10–K, filed on April 2, 2001, NETV stated that the "amount funded and advanced" by NETV to Brightstreet was "$4,000,000," and not $14 million.

Panzo, Hansen and NETV did not reveal the prior activities of Panzo, including his relationship with Appel. In August 1991, Appel was barred from the securities industry for life by the NASD. In 1992 and 1993, Panzo was employed as an executive vice president of HMA Investments, a company in which Appel was a principal.

After Panzo left HMA Investments Appel would arrange to have Panzo become a director of the public companies, and both Appel and Panzo would own substantial amounts of shares in the public companies and cause the companies in question to issue them stock and/or warrants for unspecified consulting or investment banking services, or as finders fees in anticipation of a contemplated merger.

Panzo and Appel would subsequently sell their shares after which the shares of the subject companies became virtually worthless, and in at least two instances, the companies in question filed for protection under the Bankruptcy Code. The first amended complaint set forth the specific

details of this collaboration in at least eight other public companies.

Appel was also a founder, investor, controlling person and a lender of NETV and/or Stonepath. Appel introduced Rozel International, a British Virgin Islands company ("Rozel"), to Panzo. Rozel as of January 20, 2000, owned more than 20% of NETV's stock and is also a substantial shareholder, creditor and/or borrower along with one or more of Appel's entitles in at least twelve public companies.

The first amended complaint alleges that Appel controls and is a beneficial owner of Rozel, that between October 31, 2000 and March 6, 2001, Rozel sold at least one million shares of NETV/Stonepath. As set forth more fully in paragraphs 63 through 66, the relationships between Appel and Panzo, NETV and Rozel were concealed.

### Summary Judgment is Appropriate

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler*

*Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues...where those issues are not material to the claims before the court...will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. In view of the facts presented here and the motion for summary judgment, it is appropriate to grant judgment under Rule 56.

### The Complaint Alleging Misrepresentation in the Size of the Offering is Dismissed

■ At the outset, the claim based on Section 12 of the Securities Act of 1933

(the " '33 Act"), 15 U.S.C. 77l, is dismissed, since the Stock was sold not by prospectus but by private placement. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). *ESI Montgomery County, Inc. v. Montenay Int'l Corp.*, 899 F.Supp. 1061 (S.D.N.Y. 1995), noted that the distinction drawn in *Gustafson* is to determine not which types of securities are exempt from Section 12(a)(2) but, rather, which transactions are exempt from the statute. *Id.* at 1064. To similar effect is *WRT Energy Sec. Litig.*, No. 93 Civ. 3610, 1997 WL 576023, *4–5 (S.D.N.Y. Sept. 15, 1997), where this Court held specifically that the Supreme Court's *Gustafson* decision concluded that the intent of Congress and the design of the statute required that Section 12(a)(2) liability be limited to public offerings and that plaintiffs have standing under Section 12(a)(2) of the 1933 Act only if they purchase their securities in a public offering rather than in a private transaction or in the secondary market. *Id.* (*citing Glamorgan Coal Corp. v. Ratner's Group, PLC*, 1995 WL 406167 *2 (S.D.N.Y. July 10, 1995)); *ESI Montgomery*, 899 F.Supp. at 1064–65; *Komanoff v. Mabon Nugent & Co.*, 884 F.Supp. 848, 857 (S.D.N.Y.1995). Given this authority, liability for untrue statements under Section 12(a)(2) made in either a written prospectus or in oral communications relating thereto is limited to public offerings and summary judgment on Emergent's first count is appropriate. Emergent does not contend otherwise.

■ The remaining claims for violation of Rule 10(b)5, Section 20 of the Securities & Exchange Act of 1934 (the " '34 Act"), common law fraud, negligent representation and rescission turn on the facts as set forth above. Federal securities law and applicable common law standards regarding securities fraud, common law fraud and negligent misrepresentation re-quire a plaintiff to demonstrate justifiable reliance upon the alleged misrepresentation that forms the basis of the plaintiff's action. *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1199 (S.D.N.Y.1990) (claim under Section 10(b) requires priority reliance); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 208 (2d Cir.2000) (common law fraud and negligent misrepresentation claims require proof of reliance). The question is whether or not the verbal statements made concerning the size of the offering could be justifiably relied upon in view of all the facts and the merger clause in the Stock Purchase Agreement.

The Stock Purchase Agreement contains 29 separate representations and warranties and 16 separate covenants in favor of the series C purchasers, including Emergent. There is no representation as to the size of the offering. Waldron reviewed the draft stock Purchase Agreement prior to closing and knew that no written representation regarding the size of the Offering was ever made. Emergent has asserted that it expected the size of the offering to be described in the Agreement, yet Emergent proceeded with the transaction, executed the Stock Purchase Agreement and funded its $2 million investment without requesting or receiving any representation in that regard.

■ Even if an integration clause is general, a fraud claim will not stand where the clause was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract. *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993); *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94–95, 495 N.Y.S.2d 309, 311–12, 485 N.E.2d 974, 976–77 (1985). The integration clause, the entire contract, and

the sophistication and knowledge of the parties must be considered in order to assess the reasonableness of a party's reliance. *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir.1996) (a fraud claim could not proceed where allegations of fraud were directly contradicted by written documents which were the product of arms-length negotiations by sophisticated parties).

■■■ In evaluating justifiable reliance, the plaintiff's sophistication and expertise is a principal consideration. *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 17 F.Supp.2d 275, 291 (S.D.N.Y.1998); *Schlaifer Nance & Co., Inc. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997); *Giannacopoulos v. Credit Suisse*, 37 F.Supp.2d 626, 633 (S.D.N.Y.1999); *Belin v. Weissler*, 1998 WL 391114, *5 (S.D.N.Y. July 14, 1998). Moreover, the sophisticated investor such as Emergent must show that he or she has made an independent inquiry into all available information. *Giannacopoulos*, 37 F.Supp.2d at 632–33; *Granite Partners*, 17 F.Supp.2d at 290. As the Second Circuit noted on this point:

> Put another way, if the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."

*Schlaifer*, 119 F.3d at 98 (*quoting Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980)).

In *Belin*, as here, plaintiff Belin attempted to avoid the effect of an integration clause in a written contract to purchase a limited partnership interest on the basis that the clause was general and did not specifically disclaim the representation at issue. *Belin*, 1998 WL 391114, *6. Moreover, the information which Belin contended was misrepresented to him, the amount of an insurance policy on Broadway actor Tommy Tune, was readily ascertainable had Belin asked to see the insurance police prior to closing on his investment. *Id.* 1998 WL 391114 at *5.

Emergent had access to financial information and other information concerning Stonepath and represented and warranted that it "has had the opportunity to ask questions and receive answers from the Company concerning the transactions ... and to obtain therefrom any additional information necessary to make an informed decision regarding an investment in the Company."

The authority cited by Emergent does not support reasonable reliance in this case. For instance, in *International Motor Sports Group, Inc.*, 1999 WL 619633 (S.D.N.Y. August 16, 1999) the court noted that when the contract states that the defendant makes no representations other than those contained in another, more exhaustive clause of the contract, a fraud claim may be precluded. *Id.* 1999 WL 619633 at *6. The Stock Purchase Agreement includes extensive representations, warranties and covenants from Stonepath in favor of the investors, and is the product of extensive negotiation and review by sophisticated investors. Emergent cannot maintain a fraud action by avoiding the plain terms of its contract.

■■■ Finally, and most critically, Emergent has not established loss causation. As the Second Circuit noted in *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992), loss causation requires a plaintiff to establish that the misrepresentation was the cause of the actual loss suffered. To establish loss causation, a plaintiff must show that the economic harm that it suffered occurred as a result of the alleged misrepresentations. *Id., see also Bennett v. United States Trust Co. of New York*, 770

F.2d 308, 314 (2d Cir.1985) ("but for" allegations relating to transaction causation do not establish the proximate cause of the plaintiff's loss).

In order to meet its burden of proving causation, Emergent cannot bootstrap the "but for" or transaction causation onto the loss causation requirement. As with the plaintiff in *Marbury Management v. Kohn*, 629 F.2d 705 (2d Cir.1980), Emergent must show that the misrepresentation caused the loss. Yun's statement regarding the inability to link the alleged decline of the share price to the alleged change in the size of the offering is dispositive. No evidence of loss causation has been presented.

■■■■ Emergent's rescission claim, based on the mistake, is also deficient. Under New York law, a remedy for mistake is available only where "a mistake of both parties at the time [the] contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances." *Hartford Fire Ins. v. Federated Dept. Stores*, 723 F.Supp. 976, 994 (S.D.N.Y.1989) (*citing Gerard v. Almouli*, 746 F.2d 936, 938 & n. 2 (2d Cir.1984)) (*quoting Restatement (Second) of Contract* § 152(1)). "The 'mutual mistake' must be as to the very nature of the subject sold...for example, where what both parties believed to be a barren cow turns out to be a calf." *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F.Supp. 749 (S.D.N.Y.1996) (*citing Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887)). In a securities transaction, where the parties were not mistaken as to the subject of their exchange...the purchase of stock...mistakes regarding the terms of the sale do not warrant restitution. *Leslie Fay*, 918 F.Supp. at 749; *see also The Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.*, No. 95 Civ. 2568, 1997 WL 563348, *7 (S.D.N.Y. Sept.

9, 1997), *aff'd in part, rev'd in part on other grounds*, 157 F.3d 933 (2d Cir.1998) (where investor claims mistake, not as to essential term of the contract...for example, what it bought...but a mistake as to products' performance..."this is not the kind of mistake cognizable under this cause of action").

Here, the record shows, at best, a unilateral mistake on Emergent's part regarding the size of the offering. In order to prevail on this theory, the party asserting the mistake must at least meet the same requirements that he would have had to meet had both parties been mistaken. *Foresters*, 157 F.3d at 939 ("as a basic proposition, a contract is made voidable by either unilateral or mutual mistake only where the asserted mistake concerns a 'basic assumption on which the contract was made.'") (*citing Restatement (Second) of Contracts*, § 152 and § 153.)

In *Foresters*, 157 F.3d 933, the Second Circuit upheld the lower court's dismissal of an aggrieved investor's claim of unilateral mistake on ground the securities contract signed by the investor expressly disavowed any legal effect for representations made outside of the agreement. *Foresters*, 157 F.3d at 940. "Given the fact that ... the contract here expressly disavowed any legal effect for representations made in the Brochures or Portfolio, they could not have constituted 'basic assumptions' as to which contract-avoiding mistakes could have been made...either by [the plaintiff] or by the parties mutually." *Id*. In this case, the equitable remedy for mistake is not available as a matter of law. Where, as here, the final documents memorializing the transaction do not confirm the alleged verbal representation concerning the size of the offering, no mistake could have occurred. *Foresters*, 157 F.3d at 940. Moreover, since Emergent can attribute no portion of its losses to the alleged mistake, as

a matter of law, the mistake cannot be material to the transaction, thus defeating Emergent's final claim.

### The Merger Clause and Absence of Loss Causation Require Dismissal of the First Amended Complaint

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations set forth in the first amended complaint do not constitute findings of fact by the Court. They are presumed to be true for the purpose of deciding the present motion to dismiss.

A court may not dismiss a complaint unless the movant demonstrates if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citation omitted); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ In its first amended complaint, Emergent alleges the falsity of the representation that NETV had invested $14 million in Brightstreet and that it relied on that representation. This allegation follows the discovery of the falsity by reviewing the NETV SEC filing on May 11, 2000. While Stonepath has resisted conceding the falsity of the Brochure by suggesting that "Investment" in the Brochure was on different valuation basis than required by the SEC, for Rule 12(b)6 purposes, and probably in fact, the Brochure and its representation were false. However, no mention of the Brochure appeared in Emergent's initial complaint, thus undercutting its reliance allegation.

The dispositive issue, however, as it was with the allegation of the size of the offering, is the effect of the merger clause. It will either be read out of the transaction, or it will bar the representation outside of the Agreement. For the reasons set forth above, the merger clause is controlling and bars a cause of action based upon the misrepresentation with respect to Brightstreet. That the Brightstreet misrepresentation was in writing perhaps only fortifies the need to include it in the Stock Purchase Agreement if it is to be a foundation for reliance.

■ Emergent's amended complaint also fails to establish the loss causation pleading requirement. In order to plead loss causation, as required in both the common law and Federal Securities law theories identified in the amended complaint, the plaintiff must establish that the misrepresentations were the cause of the actual loss suffered. *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). Mere allegations that the plaintiff would not have entered into the transaction if the misrepresentations had not occurred are plainly insufficient to establish the proximate cause of the plaintiff's loss. *Bennett v. U.S. Trust Co. of New York,* 770 F.2d 308, 314 (2d Cir.1985). With respect to the claims relating to non-disclosure of Panzo's past investment activity, the plaintiff must establish a causal connection between the omission and the injury. *Tucker v. Arthur Andersen & Co.,* 67 F.R.D. 468, 479 (S.D.N.Y.1975).

■ To establish loss causation in a non-disclosure claim, the Court must assess the market impact which arises from the non-disclosure, rather than the non-

disclosure itself. *Wolfson v. Solomon,* 54 F.R.D. 584, 592 (S.D.N.Y.1972). This Court concluded in *Unterberg Harris Private Equity Partners L.P. v. Xerox Corp.,* 995 F.Supp. 437, 442 (S.D.N.Y.1998), that disclosure of the allegedly concealed information could not be the proximate cause of the loss. *Id.* at 440–41.

Emergent does not allege a disclosure of the information regarding Panzo's prior investments ever occurred. Unlike the plaintiff in *Unterberg,* Emergent does not aver that any of the information allegedly concealed was disclosed to the market or that a decline in Stonepath's share price resulted. The only reasonable inference from the amended complaint is that all of the information recited about Panzo was available to the market...and Emergent...before Emergent invested.

Emergent relies on the Second Circuit opinion in *Suez Equity Investors, L.P. v. Toronto Dominion Bank,* 250 F.3d 87, to argue that a specific causal link between the alleged misrepresentations and the alleged injury need not be pled if the fraud effects the "investment quality" of the securities. Contrary to Emergent's argument, in *Suez* the Second Circuit did not intend to excuse a plaintiff from pleading traditional loss causation. *Suez,* 250 F.3d at 96 ("in sum, to escape dismissal of a securities fraud complaint, the plaintiff must demonstrate that the fraud caused the plaintiff to engage in the transaction and that also caused the harm actually suffered").

The allegations at issue in *Suez* are more detailed than the allegations concerning Panzo's prior investment history set forth in the amended complaint. Emergent fails to aver a connection between Panzo's past investments and the performance of Stonepath's stock. In contrast, the plaintiff in *Suez* directly linked the misrepresenta-

tions concerning the principal's personal and financial background to a decline in the stock through his mismanagement of the company. *Id.* As a result of these specific factual allegations, the Second Circuit concluded that loss causation was pled because the plaintiff alleged that the defendants' misrepresentations regarding the principal's background induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction. *Id.* at 98.

Emergent also points to paragraph 67 of the amended complaint in an effort to establish that it has satisfied the loss causation requirement with respect to Panzo's past investment history. None of the allegations set forth in this paragraph, or elsewhere in the amended complaint, establish the actual occurrence of any improper activity on the part of Panzo or anyone else who is identified in the amended complaint. The pleading is silent as to any actions on the part of Panzo that have directly resulted in a decline in Stonepath's stock price.

While Emergent pled that the statements and omissions were a "proximate cause of Emergent's economic loss and the decrease in the value of NETV's common shares," there are no facts in the amended complaint from which loss causation could be inferred.

Finally, with respect to Emergent's allegations concerning Stonepath's investment in Brightstreet, there are no facts alleged from which it could be inferred that the decline in Stonepath's common stock is attributable to a representation in a brochure that the Brightstreet investment was $14 million when, in fact, the investment was $4 million. On the authority cited above, this failure is fatal to

the claim.[2]

### The Motion to Consolidate is Granted

■ Whatever tactical purpose motivated Emergent to start the Second Action, the identity of parties and subject matter requires consolidation. The consolidated action will bear the initial file number and caption. The Second Action will be dismissed as well as the complaint in the Initial Action for the reasons already set forth.

Leave is granted to file an amended complaint in the consolidated action within twenty (20) days or within such other period as the parties may agree. Failing such a filing, both actions will be dismissed.

### Conclusion

The Stonepath motion for summary judgment in the initial action is granted. Its motion to dismiss the first amended complaint in the Second Action for failure to state a claim is also granted with leave granted to replead.

Emergent's motion for consolidation is granted, and the actions will proceed under the initial file number and caption.

It is so ordered.

---

**2.** Emergent also argues that it should be able to proceed with its common law fraud claim because New York law does not require proof of loss causation where only rescission is sought. This misapprehends the case cited in support...*Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506 (S.D.N.Y.1997). That case merely holds that the *injury* element of a fraud claim is interpreted differently based upon the remedy sought...i.e. there must be concrete economic loss to maintain an action in law, whereas a remedy in equity may be had even if the damage is not an "injury in the traditional sense". *Id.*, at 543. *Dornberger* does not address the issue of proximate cause. "The absence of adequate causation is ... fatal to a common law fraud claim under New York law."*Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 316 (2d Cir. 1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).